Our third case this morning is Community Unit School District No. 5 v. Illinois Educational Labor Relations Board. That's Case No. 4-130294. For the appellant, we have Dennis Triggs. For the appellate, Gail Marzowski and Sharon Purcell. On October 20, 2011, AFSCME was certified as the successor exclusive bargaining representative for the bus drivers and bus finders of Community Unit School District No. 5. The next day a demand to bargain was filed and the parties first met on November 7. On December 14, 2011, about two months later, the Board of Education directed the administration to explore outsourcing for solicit bids. In doing so, the Board approved a resolution and in that resolution they pointed out that they had experienced continuing reductions in reimbursable state transportation payments and that they should determine whether or not there might be some cost savings achieved by outsourcing. On April 2, 2012, bids were opened and for the first time, the Board learned that there could be significant savings, over a million dollars as compared to what the cost had been over the course of three years. On June 5, 2012, about seven and a half months after AFSCME was certified, the school board voted to outsource. In the resolution authorizing the outsourcing, it made findings of fact. The findings of fact indicate that the Board of Education had experienced grave continuing and worsening problems within the transportation department and significantly, based upon the bid, would save, in the course of three years, $4.2 million. These findings are uncontroverted. These findings are, I submit to your honors, the most salient facts in the case at hand, but the content of this resolution is really not even acknowledged or discussed. Counsel, let me interrupt and ask you a question. It's my understanding that prior to the Board taking this action that there was a decision that AFSCME would represent the bus drivers. Is that correct? AFSCME was certified about eight months earlier than the parties that bargained, well over ten times, a dozen times they met. And opposing counsel says that this was somehow done in retaliation or in response to that. Tell us what your take is on that. Well, the legislature has enacted public policy, the school board section 10-2434C, which authorizes a very elaborate, very time-consuming, very transparent process for boards of education to outsource transportation services. So prior to this decision being made, the board complied with that process. It requires notice that you're thinking about it. It requires that the vendor elaborate on the cost per category. It requires the board to share that information with AFSCME. It requires the board to do a comparison as to what the cost would have been. It requires at least no less than one public hearing. It requires that the employees who may no longer be employed by the school district receive 90 days' notice. And if, in fact, the outsourcing is consummated, then those employees are guaranteed jobs if they're qualified with comparable wages and benefits. It is, to more directly answer Your Honor's question, it is absolutely and clearly the position of the Board of Education that the outsourcing was done because of incredibly troubling and worsening operational concerns, putting children at risk. There's no litany in the record of what those problems were. There have been enormous efforts to address those problems unsuccessfully, not to mention the savings of $4.2 million. So at heart here, in this case, part of the issue is... Counsel, as I read the record, sometimes it appears that the savings was $4.2 million and sometimes it appears it was $1.5 million. Can you... Yes, absolutely. ...elaborate on that a bit? Looking at what the district had been paying with the services in-house, and then looking at the bid, the savings was $1.5 million over three years. Looking at the position of AFSCME, after bargaining and being asked, and essentially they give us your best offer, their best offer would increase costs by another $2.7 million. The difference between coming to terms with AFSCME and leaving the work in-house is $2.7 plus $1.5 or $4.2. So it's a question of what the comparison is that one is looking at. Given this elaborate statute, the district complied. No exception. I think no arguments really from the board, the ALJ, or AFSCME that we didn't comply with the statute. Likewise, of course, the... Well, in spite of that, the ALJ and the board found that we violated Section 1483 of the Illinois Educational Labor Relations Act by discriminating against employees for exercising a protected activity. They also found that we violated Section 1485 of the act by not bargaining in good faith. Even though, when it came to the bargaining, the board adhered absolutely and strictly to the guidelines laid down by this court in your case of SEIU versus Carbondale, a case which I submit to your honors governs the outcome here, but which is largely ignored by the ALJ and the agency. We submit that the ALJ and the agency took a rather tortured path to get the results that they obviously wanted. We shouldn't have to come before this tribunal to obtain this decision when a public school district's transportation department is in disarray, dysfunctional, putting kids at risk, and where we could save $4.2 million that we should be able to outsource, providing we follow the statute, which we did, and providing we follow your guidelines in terms of good faith bargaining and subcontracting context, which we did. With respect to the 14A3 violation, the ALJ and then the agency in adopting the recommended decision and order purport to apply the traditional analysis most recently articulated by the Supreme Court in the 2011 Speed case set forth in Burbank earlier. To make out a prima facie case, there must be a showing that the employer took adverse action against an employee for having engaged in protected activity. Note, there is no case law, I say again, no case law declaring subcontracting to be an adverse action. The essence of 14A3 is discrimination among employees, showing favoritism to those who are exercising their rights to concerted activity and perhaps those who don't. The outsourcing the work of a bargaining unit does not discriminate among employees. It does not create the requisite cleavage, as terminology is used in the cases, between employees who support the union cause and those who do not. Assuming outsourcing for purposes of discrimination under 14A3 can be characterized as an adverse action, there is no violation under traditional analysis without proof of wrongful intent, that is anti-union animus. The ALJ argues that wrongful intent can be found on four bases. Number one, the timing, because the outsourcing expiration began shortly after AFSCME was certified. Number two, well after all the district never outsourced before. Number three, the board allegedly did very little to try to address its problem in the transportation department. And number four, other groups of employees received more favorable treatment. I'll look at those in reverse order. As to the notion that other groups of employees received more favorable treatment, the focus was sort of on the cafeteria workers. And what is missing, and what makes that a boring, non-ridiculous suggestion, if you will, is that there's absolutely no showing that so far as the cafeteria staff is concerned, there was a problem hiring or retaining, a problem with absenteeism. All these were problems in the transportation department. Well documented. The record, there was no showing that kids were in any danger. There's no showing that students were missing instruction because their bus was late or because the food service isn't efficient. There was no showing that there was any complaints from students, parents, or public. There's no showing that there was any reason to think that outsourcing would have been a cost saving. Comparing that circumstance to the people in the transportation department, in all due respect, doesn't make a lot of sense. Then there was the suggestion by the ALJ that, well, we can show this wrongful intent, if you will, because prior to the outsourcing, you didn't do very much to address the problem. That's simply not true. During the course of eight years, managers were changed three times. There were meetings, weekly meetings, for the year preceding the outsourcing between supervisors, frequently unit district administrators, and members of the union in the transportation department to address the continuing problems. At one point in time, because of the exorbitant absenteeism, mechanics and routers, people in charge of the bus routes, were assigned to drive buses. Well, that didn't work because the buses weren't as well maintained as they ought to have been maintained. Furthermore, in fall of 2011, the Board of Education expended half a million dollars for a stopgap measure to bring in a vendor on an emergency basis to supply drivers because of this absenteeism. The suggestion that the board wasn't trying to address the problem, it was all consuming, and there were great efforts made to try to address that problem before resorting to outsourcing. Then there is the notion, well, you never outsourced before. Well, in 2003, 2004, and in 2009, that proposition arose. The suggestion, well, maybe you should outsource. But remember, the problem got worse year after year. This was a growing school district, which was adding schools, adding drivers all the time. And the need for drivers hired 65 drivers the year before they outsourced. Not to say they all stayed, not to say that we didn't have continuing worsening problems of absenteeism, but to say you should have done it sooner, even though you get to the point where you've got to scrawl the bricks and camels back, doesn't make a lot of sense. Not to mention the fact that you cannot outsource. You cannot outsource when you have a collective bargaining agreement in place, because there was a prior certified representative, and there was a bargaining agreement, and you can't outsource while that's there. You also have different board members. There's only one board member at the time of outsourcing who was on the board in 2003, 2004. I mean, there's six new people who are looking at this situation. So what it really comes down to is this inference, if you will, of wrongdoing is based upon the timing. And in the case of Lake Zurich, which is a decision of the ILRB, it's made very clear that timing and timing alone can never be the basis for finding this wrongful intent. Would it be fair to say that timing was the main consideration that the ALG made its decision on? ALJ, I'm sorry. Or am I mischaracterizing that? I don't know if I know that for sure. I'm inclined to agree with the court. Certainly timing is what is left when you look at these other things she sort of threw in. So I think it's fair to say timing was the most important proposition, yes. But she tried to build and come up with other rationales, so it's sort of hard to know for sure. But yes, I think timing is a much more critical proposition, and that's why I say you strip everything else away. Well, here you have the timing, but here you have a situation which is every month getting more and more of a problem, less and less tolerable. But she also, in an effort to find rationale for her decision, she resorts to the concept of inherently destructive action. This arises out of some federal court cases and also the Carmi decision of the Educational Labor Relations Board. In the interest of time, I'll simply underscore that this notion of an action proving by itself, without any other extrinsic basis proving that there is an anti-union bias or animus, if you will, this concept has never been adopted by Illinois courts, number one. Secondly, in the federal context where it has come up, it has never been used as subcontracting a factual pattern before. Counsel, I guess when I looked at that, I wondered what could the district have done differently? I mean, under that rationale, it would appear that any time you impact union workers, you're wrong. Well, that's absolutely correct. And I would go farther in saying if, in fact, subcontracting is inherently destructive, then why have a subcontracting statute? I mean, it doesn't make any sense. It's at odds with the policy as promulgated by the General Assembly. Furthermore, if subcontracting is inherently destructive, how does one ever sit at the bargaining table and bargain in good faith when you're looking at savings of $4.2 million? And time's not going to permit to talk very much about the 14A5 charge of not bargaining in good faith. And what happened was that we shared as we must the information in the bid, went through the numbers. I think their general agreement that it was over $4 million difference between what AFSCME was demanding, what it would cost over three years, and what we would pay if we outsource. And that's sort of where the negotiations ended, and the ALJ would fault us for relying upon the bid from the third party. But your decision says that's exactly what you're supposed to do. You're supposed to let folks know what that bid is, share it with them, be an open mind, and listen to what they have to say. But for the life of me, I have to ask the question, how much more than the cost of outsourcing are we supposed to offer in order to avoid an unfair labor practice charge? Should we offer, well, we can save four, but we're happy just to lose three. We can save four if we outsource, but what about two? What about one? I don't know how to do that. It's nonsensical. You really can't do that, and your directive in the Carbondale case says you don't do that. The ALJ even went so far as to say that we're trying to gain an unfair advantage by keying off from this vendor's proposal, and Carbondale says that's okay. That makes sense. That's what you do. So that's sort of the essence, if you will, of the charge that we failed to bargain in good faith. This school board, and as you can gather from the school boards throughout the state, are frankly anxiously awaiting the decision of this court. If you were to uphold the ILRB, you would be encouraging that agency to usurp public policy function of the legislature and, as set forth in the school code, and to ignore your holding in Carbondale, and you'd be breaking with precedent, which basically indicates that the inherently destructive concept does not apply to subcontractors. That's why Amber liked it. I think the only other point I would seek to make is that if indeed there is a prime evasion case, if subcontracting is an adverse action, never been decided to be recognized to be so before, but if it is, and then that suggests that, well, there was an anti-union animus, well, then we still have the proposition set forth in Speed District 802 case, also in the city of Burbank, that that is overcome if, by a preponderance of the evidence, the employer can show that there was a non-discriminatory reason for the alleged adverse action. At $4.2 million, and a promise of getting a department which is dysfunctional and creating enormous problems, getting that in order isn't a non-pretextual reason for taking the action, then I guess I don't quite really know what it would be. I thank the Court. Thank you. You'll have rebuttal. Good morning, Your Honors. Good morning. I'm Sharon Purcell, Assistant Attorney General on behalf of the Illinois Educational Labor Relations Board. Your Honors, in this case we're dealing with public employment, obviously. It's regulated by the legislature, various statutes, and by the courts. An employer can legally explore subcontracting out, but that's not the case here. Here we have a 1483. This is a 1483 case, basically. And the question is, what is the impetus here for the district's unified decision to contract out? The board found after the hearing, first before the ALJ and then on review by the board, that AFSCME had made its prima facie case that this was an adverse action committed. It was an ill motive. In retaliation for choosing AFSCME, a strong state-affiliated union, and leaving this meet-and-confer committee that they had been in, and that they were going to subcontract this out. At that point, then, it's up to the school district. This is a weighted evidence case. It's up to the school district then to rebut that. And under the traditional test, the board found on review of the ALJ's decision that the district had failed to do that. And it set forth its reasons, and it had the entire record. And district has its facts, and the AFSCME has its. It's the board's job. They look at this, and that's their expertise. That's what the legislature has charged them with doing. And they articulated why they were finding that on game day, UNIFI did not step up to the plate and rebut the prima facie case that they had decided to subcontract these employees. I mean, subcontracting, it's all the employees. You can think of it in this case. Subcontracting, it's done all the time. The board generally never sees it. The vast majority of cases, there's no charges, so the board's not involved in that. It's only when there's a problem. When, in addition to meeting the school code provisions, they haven't met their legal duties under the Labor Act, which provide the protections to public employees. So these exist together. The fact that the school code allows this, and it has an elaborate scheme that a school district has to follow, does not mean that once they follow that, or if as they go along they find good reasons for doing this, that they do not have to meet their obligations, their duties, their legal duties under the Labor Act. And that's what happened here, and they didn't show that. I mean, it's not just timing. You can strip out any fact and say, well, this is this, this is that, and none of them are connected. But what you have here is these employees are the only ones who chose this, asked me this, none of the other employees, so it's just them. This has been an ongoing issue. There's been various testimony about what was done about it, what was not done about it. Did it get worse over the years? Did it get worse? I think there were various problems as the school districts expanded, and so they did have other probably, you know, you have tensions. You have things that you need to work out. But none of this is a big surprise. So all of a sudden now you have, there must be some aggravating factor here that now after AFSCME and after, you know, we sat down for, you know, a bargaining, you know, it's November, they sit down and they do their initial. Now it's, you know, we have, and they told AFSCME, AFSCME, I mean that's the record is that, oh, we have these operational problems, we're considering contracting out. Are those problems real? I mean, declining money from the state, problems with kids getting to school late, problems with having drivers, problems with maintaining the buses, are those problems real? Nobody denies that, nobody denied that they didn't have problems. The question is, because you can have legitimate concerns, but what is the impetus here for contracting out? If you decide to contract out for impermissible motives, then even though you have legitimate concerns, you have to show that, you know. I guess, counsel, where I am is I'm not really convinced that it was shown that there were illegitimate reasons that there was, you know, anti-union animus. Other than this timing issue, lay that out for me. I mean, what shows that they did this to retaliate for this decision to go with AFSCME? I just am having trouble seeing that. They did, their reasons shifted as they went along, that they were telling AFSCME, it's, you know, we have these operational problems, which they had had, without seeing a need to subcontract, which they had been advised at some point earlier, some years earlier, that, you know, maybe they should think about that. And then after they get the bids, they say, oh, well, you know, we're going to save all this money. Should they have known that before they got the bids? Whether or not they should have known that, that's not really, because if you're doing something illegal, I mean, if you're doing this for an illegal reason, and then later you get something that's like, oh, this is a good idea, everybody's going to like that, that doesn't negate your improper motive in the beginning. It's as if, if instead of these employees were, you might have a unit of... I'm sorry, let me interrupt you. So let me ask you this question. Are you saying any time a decision is made to go with a different representative body, you know, on the part of the union workers, they decide to be represented by someone else, then we should assume that any action taken by the board is in retaliation for that? I mean, what is the proof that that was retaliation, that they were punishing them for going with them? No, Your Honor, you would never do that. These are always on a, they're always fact-specific. You're going to look at... Okay, so what are the facts here? The facts are that up until, I mean, timing is not, it's not that you can't look at timing. I mean, timing is legitimate. But, I mean, if you had nothing else to support that, then you would say that's not it. But here you do have other things to support that. And if you want to, like, pull everything out and not see everything. So what does that mean? As, you know, here's the world that we're living in, which is, you know, these problems have been ongoing. You know about these problems. This happens, you know, at this time. Your explanations are changing. They're not always the same. You know, and you might have, you know, if you have a legitimate reason, but that was not the impetus for this decision, then those legitimate motives don't, as I said earlier, you know, it doesn't erase that you had this, this is really why you were doing this in the first place and now you've got these justifications. But, I mean, the Labor Board has never, it would never, it could never say that subcontracting in and of itself is, you know, illegal. You can't do it, it's a violation. No. It's always on the facts. And the SEIU Carbondale, the service employees case, that one, there was no, the court and the board didn't consider that. There was no A3 there. You know, I mean, so it's a different, it is a different case and you can go through all the bargaining, but if your motive in the first place is not, if you've got an ill motive, then that's going, the bargaining flows from that. That's where the sham bargaining comes in. But you're not going into it with an open mind and an actual intent to read. Counsel, do you agree with Mr. Triggs that the inherently destructive theory has not been adopted by any Illinois court? I don't know of a case where it adopted it. It's, you know, the inherently destructive theory, that's another weight of the evidence. How are you going to weigh this evidence? And here, you know, I mean, the court did, I mean, the board did the traditional and then it engaged, it said, you know, looking at these facts, these are egregious facts, and so it talked about the inherently destructive, but it didn't rely on that and even, I mean, you could say, yes, dicta, we don't even need that. Under the traditional test, this Unit 5 just failed to show, you know, it failed to rebut that prima facie case that it was doing these things. And the, you know, I mean, the legislature has set up this system where the labor board looks at these facts, they decide these things, and unless, you know, unless the facts, which are prima facie true and correct, are, you know, against the manifest weight of the evidence, that is, there's not any evidence in the record to support them. Okay. You are out of time. Thank you very much. Thank you, Your Honor. Thank you. Good morning. Gail Marsalski, perhaps. I'm going to try and, I think, address some of your questions that you've raised in order to kind of stay in the area that the court seems to be interested in. Initially, I have to say that this is a first and foremost, I believe, a 1483 case. And I believe that there were many factors that led to the board determining, and when I say factors I mean circumstances which show anti-unanimous, that they're going to consider contracting out. Because this district, and the record is replete, had had problems with its transportation department for years. They knew they were opening a new school, yet, and they had many applications for bus drivers. AFSCME had won the election in August, and they failed to hire, they failed to train properly. I mean, they set it up. I don't know how else to put it, or at least that's, I believe the facts show that, and I've discussed that in my brief. So, in 2009, they're told by a consultant they hire that maintenance employees should not be driving buses. Yet, they continued to drive buses for two years. In 2011, all of a sudden, maintenance employees cannot drive buses, even though we don't have enough bus drivers to drive the buses. Two years. What was the difference? Why in the two years? I mean, they say, oh, it's because we needed to pick up students, which of course they did. But, in fact, what happened is that AFSCME won the election. That's what happened. AFSCME won the election. And they, meaning the school district, school board, reacted to that. And once AFSCME was certified and requested to bargain, it took very little time for the district, I think it was five weeks, to say, oh, I think we're going to contract this out. This is what we're, this is where we're going. So we have all these facts leading up to that pronouncement. And then what happens, is there anything that happens after that that sort of says, oh, you know, no, it wasn't really because the employees selected AFSCME. It really was for other reasons. No, because if you look at the bargaining, there was absolutely no proposals based on the operational issues. AFSCME discussed an attendance policy wasn't provided. The district never came up with an attendance policy. There was absolutely nothing that happened at the table that addressed those operational issues. AFSCME would make proposals. The district didn't respond. I mean, yes, there was testimony from Mr. Triggs at the hearing. Oh, I don't think those ever worked. That wasn't even said to AFSCME. So, in fact, yes, okay, they met, but they did not meet with the intent to reach an agreement. And that's kind of all part of the spectrum. And then you get at the end and you see, they talk about late bus. Late bus is horrible. You get a memo. It's in the record from the superintendent to the board. We have solved the problem for late buses. Did they solve it by contracting out? Was it because of the bus drivers? No. It was because the schedule was inappropriate. The school schedule in terms of opening times or starting times and closing times. So, you get to that point and you have the superintendent saying, oh, we've solved the problem of the late buses by changing the schedule. And then you keep going and you get no counter proposals from the district on the issue of wages, working conditions, changing the starting salary, moving things around, nothing. Nothing at all. Here's the first student proposal. Now, you know, there's a lot here and if you read the briefs, it's, oh, my gosh, there's going to be contracting out is inherently destructive. There's absolutely no basis for that statement. As the board argued here, contracting out is a part of not only our statutory scheme, but long before that statute came into existence, the board recognized contracting out was one of the very first cases before the board as to whether or not contracting out is appropriate. This court in SEIU said, yes, you can contract out. You have to actually meet the negotiations, can't be shammed, and there cannot be anti-union animus. That's what you said. With regard to the test then once it comes down, the position being that we did show anti-union animus, it's not just that they advance a legitimate reason, because the Supreme Court has said just offering a legitimate reason doesn't end the inquiry. You have to determine whether or not, in fact, the reason is legitimate or is it pretextual, and I would submit that it is here given the history in this district, is it pretextual, and even if there is some bona fide legitimacy to it, is that the real motivation? Or is the motivation something else? That is, if they had not selected, used their rights, and selected AFSCME, would they have still, even with these reasons, contracted out? Now that the board deserves and should, under Illinois law, get deference on, and they found that, in fact, they would not have most likely contracted out, had it not been for the selection of AFSCME. And that's really the main question here. It's a 14A3 case that follows through into the bargaining, into whether or not there is, whether the bargaining had an intent to reach an agreement, an intent to actually discuss the issue, an intent to consider the proposal. I would submit that the record supports a finding that it does not. I also just want to point out that the issue of motivation... Is there any evidence in the record that the board ever expressed any hostility towards union activity? I don't believe there is any specific evidence that the board expressed hostility in the manner which I believe Your Honor is suggesting. There is some evidence, and I pointed it out in my brief, that once AFSCME was determined, they decided to put in these lead workers to gather grievances. That's why you select a union, you don't put in employees for that. They did some other changes to terms and conditions of employment. And this is in between certification and of the election. They put in a time punch system rather than the system they used before. But there were some other changes, and I believe I do go through them in my brief. So we would submit that that does in fact show hostility towards unionization. The fact that they never said, we don't want AFSCME, or if you select AFSCME where something bad is going to happen to you. It doesn't happen very often in discrimination cases that you get that kind of smoking gun. We would definitely say that the activity of the board does show hostility towards the union, towards AFSCME coming in as the union. And so it's our position that yes, that is part of the factual record here, which under... Well let me ask you about the shifting explanations. Yeah. And Justice Holder-White I think touched on this earlier. Once the first student was contacted and the district found out or the board found out of the cost savings, was it wrong for them then to add that to the considerations of why they were considering subcontracting out? You can only say it's wrong because they started out with a motive that wasn't appropriate. And illegal. And then the other reasons that they offered, they never addressed in discussions. And then, ta-da, we have $1.5 million in savings, which frankly a school district the size of this school district not to have done any kind of research or figured out about subcontracting. And I have to in that regard say that the superintendent specifically testified that he had worked with First Student before. So in a different district. So it would seem that there had to be some knowledge there, but it was never expressed. However, I think that you have to go back to what the actual motivation was versus picking out a particular event that occurred long after the illegal activity of the district began. Counsel, you're out of time. Yeah, I can see that. Thank you very much, Your Honor. Rebuttal, please. May it please the Court, as to the proposition getting it worse, the record is repeat that the circumstances got worse. It's only in recent years that we have special ed students dropped at the wrong address. We had kids left on buses. We had absentees of 20 to 30 percent, folks not showing up for work. It's consuming maybe 30 percent of the time of district administrators. People don't have time to deal with educational issues. The record will stand for itself as to whether or not it was getting worse. It's worse in part because you're adding routes, because you're a growing school district. Counsel, let me ask you this. The whole point of their argument is basically you started off on the wrong foot, and you can't right that by having legitimate reasons later on down the road. What do you have to say about that? There was no shift. That's why I cited at the beginning of my argument, if you please, that the resolution, that the first resolution was passed months before any outsourcing was in part to explore the potential of any cost savings. I think, well, I know the record will show that when the AFSCME representative was informed that we're going to look at outsourcing, we had a conversation with in-house counsel, Mr. Curt Richardson, that he told her at the time that the principal reason, no doubt about it, the principal reason is operational concerns, but there might also be some cost savings. So you can't really make cost savings your paramount reason for outsourcing when you don't know if there are any. And you don't know if there are any. In fact, there are two bids. The first bid, there was no bidders. You really don't know until you get the bids. Once you get the bid, then it is obviously you have a responsibility to respond to the cost savings. So it was always there. It absolutely was secondary until the district learned. It is possible the district would have outsourced if there was not any cost savings. You know, that's what we'll never know. We never got to that point. There was a suggestion that things weren't discussed during bargaining. I'm not sure I followed that. But, in fact, about 90% of the issues were resolved. There was very active give and take at the bargaining table. And the economics, it was difficult to get an economic proposal from AFSCME. If you read the record, it's being requested. Please tell us what your position is. And then when they made a proposal, it was going to be millions of dollars more costly than outsourcing. Then the next proposition is, you know, sort of, you know, how close can you come? Give us your best offer, which they chose not to do. So the economics becomes paramount. It wasn't there at the beginning because we didn't know. In fact, we're shocked. If you look at the Carmine decision, it's interesting that the employer there, a subcontracting case for the labor board, the employer was shocked at the savings. He didn't really expect to see that. But there it was. There was a suggestion made, an argument that, well, the inherently destructive is sort of an outgrowth of weighing in the evidence. I don't really follow that. I think what I witnessed here this morning was an effort to step away from inherently destructive. But you read the ALJ's decision, recommended decision orders adopted by the board. It's a pretty critical part of it. And it doesn't fit. And it's bad law. So I don't quite understand how inherently destructive is part of the weighing in the evidence. But be that as it may, that proposition doesn't fit. It's not consistent with the law. There was, at the end, a suggestion. Well, there's no give or take or compromise on the economics. I already sort of addressed it. I don't really quite know how to do that. How many more millions should we say we're willing to pay over what we are required to pay by reason of outsourcing? And I would also note that we always learn something. A suggestion here that this was a setup. And that's just so strange of an idea that this public school district and seven board members were in some sort of scheme here to have a setup so that we could get to the point of outsourcing. That's almost beyond my comprehension. Those folks who were living with the trauma of a system that was broken and taking phone calls day and night because kids taking an hour and a half to get to school or left on the bus or missing class time, that they orchestrated that? It was a setup? I guess maybe I should be respectful and not take that suggestion very seriously. So, no, there was no shifting. And it was simply a proposition that you've got to have the economics before you really know if that becomes a basis to take the action that you took. Thank you all. Thanks to all of you. The case is submitted and the court stands in recess until after lunch.